### NEIN v. LA CROSSE CITY RY. CO.

(Circuit Court of Appeals, Seventh Circuit. February 23, 1899.)

#### No. 522.

STREET RAILROADS—COLLISION WITH BICYCLE—NEGLIGENCE.

Plaintiff, who was deaf, was riding a bicycle, and crossed one of the two parallel tracks of an electric street railroad, not more than 50 feet in front of an approaching car, and, turning, continued in the same direction the car was moving, riding in the space between the two lines, which was 4 feet wide. Not exceeding 20 seconds later his arm was struck by the passing car, and he was thrown from his bicycle, and injured. The motorman on the car turned off the current when he saw plaintiff start across the track, but turned it on again when plaintiff had crossed, though he continued to sound his gong until the accident occurred. He had no knowledge of plaintiff's deafness. *Held* that, giving plaintiff the benefit of the broadest construction of the qualification of the rule as to contributory negligence, which would permit him to recover notwithstanding his own gross negligence, if defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of such negligence, there was nothing in the evidence to charge the defendant with liability, as the motorman was justified in supposing that, after having crossed in safety, plaintiff would keep at a safe distance from the track until the car passed.

In Error to the Circuit Court of the United States for the Western District of Wisconsin.

This was an action by August Nein against the La Crosse City Railway Company for personal injury. The court directed a verdict for defendant, and plaintiff brings error.

This suit is brought to recover for personal injuries sustained under the following circumstances: Caledonia street, in the city of La Crosse, runs north and south, is about 50 feet in width, from curb to curb of the sidewalk, and at the time of the injury was a smooth macadamized street. The center of the street was occupied by the two tracks of the railway of the defendant company, the west track being used for south-bound cars, and the east track for north-bound cars. The space between the tracks was 4 feet in width, also smooth paved. Each track was 4 feet 8½ inches in width. It was the custom of cyclists to ride in the space between the two tracks on this street, and such riders ordinarily turned out of the space upon hearing the gong of an approaching car, but, as stated by one witness for the plaintiff in error, "some leave just at the last moment, and some don't; some turn out pretty quick, and others take more chances." In the early afternoon of July 1, 1896, the plaintiff in error, a man of mature years, was riding his bicycle, going north, on the east side of Caledonia street, until he arrived at the crossing of Wind-

sor street, when he turned west, crossing the east track, and continued northerly on Caledonia street, in the space between the two tracks, and at a speed of from 10 to 12 miles an hour, as estimated by him. He testified that, as he crossed, "I looked around after I reached the center of the tracks, but I did not see a car near enough to strike me when I went between the tracks. I did not see a car at all, as far as I looked. This is a straight street. I could see a car three blocks away on it, if I looked back far enough and looked high enough. I don't remember how far back I did look, but I simply used my judgment to see if I could reach the track before a car reached me, and I came to the conclusion that I could reach the track before the car reached me, and I paid no further attention to it. One thing you must remember, I took care to ride fast. I relied upon my speed to keep out of the way of a car, if a car should approach me, if it did not approach me too suddenly. I could see the dashboard, if it did not approach me too suddenly. * * * I glanced around to see if there was any car coming from the south, but I don't think I looked quite far enough." At another time he said, "I rode fast, to keep out of reach of the car, if one should come." As a matter of fact, a north-bound car was approaching, and was from 30 to 50 feet south of the rider of the bicycle as he crossed the track into the space between the two tracks, at the intersection of Caledonia and Windsor streets. The speed at which this trolley car was going was variously estimated at from 10 to 18 miles an hour, but the testimony is concurrent that it was proceeding at the usual and ordinary rate of speed. The plaintiff was extremely deaf, and could not·hear the sound of the gong on the car. He proceeded northward, in the space between the tracks, without looking around, and at a point, as stated by Steves, a witness for the plaintiff, who was an eyewitness of the accident and of the circumstances leading up to the accident, and who measured the distance, 100 feet north of the center of Windsor street the car overtook plaintiff, and some portion of it, probably not the dashboard but the forward part of the body of the car, struck his elbow, he lost his balance, fell against the side of the car as it passed, was thrown to the ground as the car got beyond him, and received the injury complained of. The motorman in charge of the car was not acquainted with the plaintiff, and did not know that he was deaf. When he saw the plaintiff cross the track from the east side of the street, he shut off the electric current, and "took up the slack in the brake." When the plaintiff got to the west side of the track, the motorman turned on the·current. He sounded the gong from the time he saw the plaintiff attempt the crossing of the track until the latter was struck. No attention was paid by the plaintiff to the gong, nor did he change his direction or look around. The issues presented by the pleadings are: (a) Was the defendant guilty of negligence in the management of the car? (b) Was the plaintiff guilty of negligence contributing to the injury? (c) Did the motorman, knowing that the plaintiff was unaware of the approach of the car and that it would be dangerous to attempt to pass him, neglect to stop the car or to decrease its speed? At the trial, upon the conclusion of the evidence, the court below directed a verdict for the defendant, which ruling is here alleged for error.

R. P. Wilcox, for plaintiff in error.

G. M. Woodward, for defendant in error.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

No negligence is seriously imputed to the defendant in the management or operation of the car up to the moment when it is said the motorman should have appreciated the situation and turned off the current, decreasing the speed of the car, or have brought it to a stop. The ordinance of the city expressly permits a speed of 20 miles an hour, and there is nothing in the situation to charge a less

speed as negligence up to the moment before the collision. It is plain as noonday, and practically conceded, that the conduct of the plaintiff was grossly negligent, amounting to recklessness. The space between the tracks is a dangerous place in which to drive a bicycle. It is recklessness to ride there while a car is passing. Those who ride wheels in that space rely upon the warning of the gong to enable them to make timely escape from collision with a coming car. Under those circumstances, the act is more or less negligent; for the rider may not accurately estimate the speed of the car, or know the possible obstacles in the road to his speedy escape from danger. Some riders, it seems, more reckless than others and confident of their own ability and skill, would wait until they saw the dashboard of the passing car before turning out, and, as a witness expresses it, "take more chances." The plaintiff, by reason of his infirmity, could not depend upon hearing the gong. He knew he might be overtaken by an approaching car, and, to use his own language, he relied on his speed to keep out of the way of a car if a car should approach him, if it did not approach him too suddenly; "I could see the dashboard, if it did not approach me too suddenly." If he was traveling, as he says, at the rate of 12 miles an hour, and the car was traveling at the rate of 18 miles an hour, the highest limit of speed stated, the car was moving, as to him, at the rate of 6 miles an hour. Without assuring himself that no car was approaching, when in fact the car was not to exceed 50 feet south of him, he crossed the track. He proceeded in this dangerous path, knowing that he was liable to be overtaken by a car, and relied upon his ability, after seeing the dashboard of the passing car, to turn out and escape the danger. Being deprived of hearing, he was bound to greater diligence, in the exercise of the sense of sight, to ascertain the danger that he knew was probable and likely to come upon him. Therein he wholly failed. If he looked as he crossed the track, he looked, as he says, merely to see if he could cross without being overtaken by a car. It is incomprehensible that, with nothing to obstruct the line of vision, he did not see this car 50 feet away from him when he looked. We are constrained to believe that his glance, as he crossed, was merely along the track for a few feet, to see if he could cross it ahead of any coming car. His relation of the transaction shows that, as he traveled northward in the space between the tracks, he paid no attention to the coming of a car; relying, as he states, upon his speed to keep ahead of a car, and, if one should overtake him, upon his ability to turn out upon seeing the dashboard of the overtaking car. It is difficult to find language to fittingly characterize the recklessness of the plaintiff's conduct. Beyond any question, as matter of law upon undisputed facts, he was guilty of gross negligence. It is possible, perhaps probable, that rapid passage through the air causes exhilaration to a degree that begets indifference to and disregard of danger, or possibly a desire to incur it; but whether such perversion of judgment or aberration of the intellect results from voluntary intoxication caused by the inhalation of ozone, or from the imbibing of spirituous liquors, the law does not excuse the want of ordinary care which one should take to guard one's personal safety.

It is, however, insisted that, notwithstanding his negligence, the plaintiff is still entitled to recover if the defendant, or its agent, the motorman, after becoming aware of the plaintiff's danger, did not use ordinary care to avoid injuring him. This proposition is founded upon the qualification of the general rule that no action will lie if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution in the person injured, the qualification being that the contributory negligence of the injured party will not defeat the action if the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence. This qualification is asserted and upheld in Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653; Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679; and has been recognized by this court in Railroad Co. v. Wilson, 46 U. S. App. 214, 22 C. C. A. 101, and 76 Fed. 127; and in Railroad Co. v. Johnson, 53 U. S. App. 381, 27 C. C. A. 367, and 81 Fed. 679. The rule is commonly grounded upon the theory that in such case the negligence of the injured party is not the proximate cause of the injury, but a remote cause, inducing the dangerous position; and as that was known to and could have been avoided by the exercise of reasonable care, the act or omission of the injurer, in doing or in failing to do that which with such knowledge he ought not to have done or should have done, was the proximate cause of the injury. In some jurisdictions this qualification of the rule is limited to cases where the negligent acts of the parties are distinct and independent, the act of contributory negligence preceding in point of time the negligent act occasioning the injury; and it is held that when both parties are contemporaneously and actively in fault, and the fault of each relates directly and proximately to the occasion from which the injury arises, no recovery can be sustained. Murphy v. Deane, 101 Mass. 455; O'Brien v. McGlinchy, 68 Me. 552; Holmes v. Railway Co., 97 Cal. 161, 31 Pac. 834. If this limitation of the qualification of the rule is proper, it is clear that the plaintiff ought not to recover, for his negligence was active up to the time of the injury and efficient to promote it. In the conclusion to which we have arrived upon the evidence, we find it unnecessary to consider the correctness of this limitation of the qualification of the rule, and for the purposes of this case, without deciding the question, we assume as correct the qualification of the rule in its broadest significance. We therefore examine to see if upon that ground the evidence was sufficient to carry the case to the jury, and in such an investigation we give to the facts, as we ought, that construction, and allow all inferences that are most favorable to the plaintiff. It is a fact established beyond contention that when the plaintiff crossed this track the car was from 30 to 50 feet south of him, and northward bound. The man who was an eyewitness to the transaction from the time the plaintiff crossed the track to the time when he was struck, who knew where he fell and who measured the distance, states that the car overtook plaintiff 100 feet north from the center of Windsor street; so that the car went 150 feet in distance while plaintiff was going 100 feet. That corresponds with the relative speed established by the evidence. At the highest rate of speed testified by the plaintiff's

witnesses, the car would traverse that distance of 150 feet in 10 seconds, and the plaintiff would traverse the distance of 100 feet in the like time, and this proves that the relative speed of the car and of the plaintiff was in the ratio of 3 to 2. At the lowest rate of speed testified as to either, namely, 9 miles an hour for the car and 6 miles for the plaintiff, the distance would have been passed in 20 seconds. This is, perhaps, material only as suggestive of the time which the motorman had to comprehend the situation, and to be satisfied that for some reason the plaintiff did not propose to leave his dangerous position, and collision was probable. The motorman had the right to presume that, upon the sounding of the gong, the man would timely leave his position of danger. He had the right to presume that the plaintiff either knew of his danger or would discover it in time to leave the space between the tracks before injury resulted. Seeing the plaintiff cross the track, he turned off the current until the plaintiff had passed; then turned it on again, as was right. He sounded his gong, and continued to sound it until the collision. He knew that cyclers, accustomed to drive their wheels in the space between the tracks, usually turned out upon the sounding of the gong, while more venturesome, and possibly more expert, ones, delayed, as it would seem, from mere disposition to incur hazard, until they saw the dashboard of the passing car. He did not know of the infirmity of the plaintiff. What was there in the situation to cause him to believe that the rider of this bicycle, following the natural instinct to escape from danger, would not leave his exposed position? In that period of 10 or 20 seconds of time, having the right to presume up to the last moment, when collision was certain and imminent, that the plaintiff would abandon his dangerous position, we see nothing in this evidence which can reasonably charge him with the knowledge or the belief that the rider was not in full possession of his senses, knew the car was coming, and would timely remove himself from danger. The rider, so far as the motorman could know, was in full possession of all his faculties and in full control of his bicycle. He knew that the slightest change to the left in the rider's course would carry him beyond danger of being touched by the coming car, and that act on the part of the rider could be instantaneous,— much more rapid than a step by a pedestrian. We perceive nothing in the evidence which indicates wantonness or recklessness or failure of reasonable care on the part of the motorman, nor anything in the situation that suggested the necessity of stopping the car or slackening its speed. If we should hold that it was the duty of the motorman to decrease the speed of the car immediately upon sounding the gong, we should impose upon these public carriers the duty of the highest diligence, and not the duty of ordinary care, which the law requires. In our judgment, it would have been the duty of the trial judge, under the circumstances, to have set aside a verdict which found otherwise than as directed, and therefore the ruling complained of was correct. The judgment is affirmed.